UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

1836 LLC; JARED GEE; and DAVID ABT

Plaintiffs,

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; UNITED STATES DEPARTMENT OF JUSTICE; TODD BLANCHE, in his Official Capacity as ATTORNEY GENERAL OF THE UNITED STATES; and ROBERT CEKADA, in his Official Capacity as DIRECTOR OF THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES,

Defendants.

Civil Case No. _______________

**COMPLAINT**

*The power to direct the removal of gun-powder is a branch of the police power, which unquestionably remains, and ought to remain with the states.*

Joseph Story, 2 *Commentaries on the Constitution of the United States* § 1024, at 483 (Boston, Hilliard, Gray & Co 1833).

Plaintiffs 1836 LLC, Jared Gee, and David Abt, by counsel, file this Complaint against Defendants Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), United States Department of Justice, Todd Blanche, in his Official Capacity as Attorney General of the United States, and Robert Cekada, in his Official Capacity as Director of ATF, and state as follows:

## NATURE OF ACTION

1. Plaintiffs have the knowledge, experience, and desire to manufacture and deal in firearm silencers in Texas. Based upon their experience with the burdensome registration scheme that makers or dealers must comply with to lawfully make or deal in silencers, Plaintiffs have no desire to manufacture and deal in silencers in interstate commerce.

2. The United States Constitution grants power to Congress "To regulate commerce with foreign nations, and among the several states, and with the Indian tribes." U.S. Const., art. I, Sec. 8, cl. 3.

3. Congress passed 18 U.S.C. § 923(a) which requires that "No person shall engage in the business of importing, manufacturing, or dealing in firearms, or importing or manufacturing ammunition, until he has filed an application with and received a license to do so from the Attorney General."

4. 18 U.S.C. § 921(a)(3) defines firearms to include "any firearm muffler or firearm silencer."

5. Through 18 U.S.C. §§ 922(a)(1)(A) and 923(a), enforced by the criminal penalties of 18 U.S.C. § 924(a)(1)(D), Congress prohibits Plaintiffs from manufacturing and distributing firearms silencers wholly in intrastate commerce unless they first obtain a license and pay a fee to the Attorney General of the United States.

6. The purpose of the 18 U.S.C. § 923(a) license is to enable the holder "to transport, ship, and receive firearms and ammunition covered by such license in interstate or foreign commerce during the period stated in the license." 18 U.S.C. § 923(c).

7. Thus, Congress is requiring Plaintiffs, who desire to manufacture and deal in firearm silencers in intrastate commerce, to obtain and pay a licensing fee whose stated purpose is to enable them to engage in interstate commerce, something that Plaintiffs are not interested in engaging in.

8. This action presents as-applied challenges to 18 U.S.C. §§ 922(a)(1)(A), 923(a), and 924(a)(1)(D) (the "GCA licensing provisions"), and facial and as applied challenges to the NFA's registration, transfer, and reporting requirements for untaxed firearms and the regulations implementing them.

9. These provisions, and Defendants' enforcement of them, exceed Congress' enumerated powers under the Commerce Clause and the Necessary and Proper Clause, violate the Second Amendment, and invade the powers reserved to the States and to the people by the Tenth Amendment.

10. Plaintiffs acknowledge that *Gonzales v. Raich*, 545 U.S. 1 (2005), and *Wickard v. Filburn*, 317 U.S. 111 (1942), have been read to permit federal regulation of some purely intrastate economic activity. As explained below, those decisions do not control here. To the extent they do, Plaintiffs contend they were wrongly decided, and Plaintiffs raise their Commerce Clause claims in good faith to preserve them for review by the Supreme Court.

## JURISDICTION AND VENUE

11. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this civil action arises under the laws of the United States.

12. Plaintiffs seek equitable relief to prevent federal officers and entities from acting unconstitutionally. *See Free Enter. Fund v. PCAOB*, 561 U.S. 477, 491 n.2 (2010).

13. This Court has jurisdiction to grant the declaratory relief sought, pursuant to 28 U.S.C. § 2201, and additional relief pursuant to 28 U.S.C. § 2202. Plaintiffs seek costs and attorneys' fees under 28 U.S.C. § 2412.

14. The United States has waived sovereign immunity for this action, which seeks relief other than money damages. 5 U.S.C. § 702. Plaintiffs also invoke this Court's inherent equitable

authority to enjoin unconstitutional action by federal officers. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).

15. The Anti-Injunction Act, 26 U.S.C. § 7421, does not bar this suit as the license fees in this case are not assessed under the Internal Revenue Code. "The fees are therefore not 'taxes' within the scope of the Anti-injunction Act." *Federal Energy Administration v. Algonquin SNG, Inc.*, 426 U.S. 548, 558 n.9 (1976).

16. Nor do the Anti-Injunction Act or the federal-tax exception to the Declaratory Judgment Act, 28 U.S.C. § 2201(a), bar Plaintiffs' NFA claims. Those claims do not seek to restrain the assessment or collection of any tax. Congress has reduced to $0 the making and transfer taxes on suppressors, Pub. L. No. 119-21, § 70436, and Plaintiffs challenge only the registration, transfer-approval, and reporting requirements that survive the repeal. A suit challenging a regulatory mandate, rather than a tax, falls outside the Anti-Injunction Act even when the mandate is backed by penalties. *CIC Servs., LLC v. IRS*, 593 U.S. 209 (2021).

17. Venue is proper in this Court because Defendants are officers and agencies of the United States, no real property is involved in this action, and Plaintiffs reside in this judicial district. 28 U.S.C. § 1391(e)(1).

**PARTIES**

18. Plaintiff 1836 LLC is a limited liability company formed under the laws of Texas in 2023 with its principal place of business in Johnson County, Texas, within this district. 1836 LLC was established for the sole purpose of manufacturing and dealing in firearm silencers in the state of Texas pursuant to Texas law, including Tex. Gov't Code 2.001 *et seq.*

19. Plaintiff Jared Gee is a citizen of the United States and a resident of Johnson County, Texas, within this district. Plaintiff is a member of 1836 LLC. Gee is a member of Elite Precision

Components LLC ("EPC") which was a federally licensed firearms dealer. Based upon his experience in dealing with the Defendants with EPC, and the bureaucratic red tape that is involved in the interstate manufacture and dealing in silencers, Gee intends to manufacture and deal in firearm silencers only in intrastate commerce and avoid the burdensome red tape imposed by Defendants.

20. Plaintiff David Abt is a citizen of the United States and a resident of Johnson County, Texas, within this district. Plaintiff is a member of 1836 LLC. Abt was a member of EPC which was a federally licensed firearms dealer. Based upon his experience in dealing with the Defendants with EPC, and the bureaucratic red tape that is involved in the interstate manufacture and dealing in silencers, Abt intends to manufacture and deal in firearm silencers only in intrastate commerce and avoid the burdensome red tape imposed by Defendants.

21. Defendant Bureau of Alcohol, Tobacco, Firearms and Explosives is a bureau within the DOJ and is headquartered at 99 New York Avenue Northeast, Washington, DC 20002. The ATF is a delegated authority to enforce federal firearm laws, including the NFA's taxation, registration, and licensing provisions. *See* 28 U.S.C. § 599A; 28 C.F.R. § 0.130; 18 U.S.C. § 926(a). The ATF receives and processes NFA-related registration applications, issues approval determinations on those applications, and maintains the National Firearms Registration and Transfer Record, the central registry of all NFA-regulated firearms that "are not in the possession or under the control of the United States." 26 U.S.C. § 5841(a).

22. Defendant Robert Cekada is the Director of the ATF and is responsible for overseeing the Agency's enforcement of the NFA's taxation and registration provisions. *See* 28 C.F.R. § 0.130(a)(1)-(3); 28 U.S.C. § 510. Director Cekada is being sued in his official capacity.

23. Defendant Department of Justice is headquartered at 950 Pennsylvania Avenue Northwest, Washington, DC 20530. The DOJ is the executive department with authority to enforce federal laws, including the NFA's taxation and registration provisions.

24. Defendant Todd Blanche is the United States Attorney General. He oversees the DOJ. 28 U.S.C. § 501, 503. He is vested with authority to enforce federal firearms laws, including the provisions of the NFA at issue in this case. *See* 26 U.S.C. § 7801(a)(2). Attorney General Blanche is being sued in his official capacity.

**PLAINTIFFS' INTENDED CONDUCT AND THE CREDIBLE THREAT OF ENFORCEMENT**

25. 1836 LLC is ready, willing, and able to begin manufacturing suppressors. It has acquired CNC machines and tooling, a laser welder and welding lathe, CAD software, lease of warehouse space, website development, and much more. Total costs for setting up 1836 LLC to comply with Texas law to manufacture silencers in intrastate commerce cost plaintiffs approximately $ 400,000.

26. 1836 LLC will manufacture suppressors in Texas and will sell them only to Texas residents in transactions completed in Texas. Each suppressor will be marked "Made in Texas." 1836 LLC made suppressors will only be sold at locations in Texas and sold to individuals showing a Texas Driver's License. For transactions conducted on 1836 LLC's website, they will cancel all orders that show a shipping address outside the state of Texas. Furthermore, their website requires the buyer to check a box affirming that they are a Texas resident and that this transaction is limited to shipping to only Texas residences.

27. Gee and Abt intend to make and sell suppressors through 1836 LLC on these terms and would begin doing so within three days of obtaining relief from this Court. But for the challenged provisions, 1836 LLC would be manufacturing and selling silencers to Texas residents located in Texas. It has forgone an estimated $2,500,000 in revenue.

28. Through EPC, Gee and Abt experienced the federal licensing regime firsthand, including wait times for license and application approvals, compliance inspections, and recordkeeping burdens. EPC spent approximately 25% of its time dealing with regulatory compliance required by Defendants.

29. Plaintiffs will not obtain a federal firearms license or pay the special occupational tax to engage in purely intrastate commerce. They refrain from manufacturing and selling suppressors only because doing so without a license would expose them to prosecution under 18 U.S.C. § 924(a)(1)(D) and 26 U.S.C. §§ 5861 and 5871.

30. That threat is concrete. After Texas enacted H.B. 957, codified at Tex. Gov't Code § 2.001 *et seq.*, ATF issued an open letter to all Texas federal firearms licensees advising that federal law continues to govern suppressors made and sold within Texas and that Tex. Gov't Code § 2.001 *et seq.* does not exempt anyone from federal licensing, registration, or criminal liability.[1] Defendants have never disavowed enforcement of the challenged provisions against intrastate manufacturers and dealers.

31. Plaintiffs therefore face a credible threat of enforcement and may challenge the provisions before they are prosecuted. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014).

## STATUTORY AND CONSTITUTIONAL FRAMEWORK

### National Firearms Act of 1934 – annual and transfer taxes imposed under Congress's taxation authority

32. Congress enacted its first comprehensive firearm regulation, the National Firearms Act of 1934 ("NFA"), using its constitutional taxation authority. 48 Stat. 1236. *See* also, *Sonzinsky v. United States*, 300 U.S. 506 (1937).

---

[1] U.S. Dept. Of Justice, July 26, 2021, *Open Letter to All Texas Federal Firearms Licensees* available at https://www.atf.gov/media/16781/download.

33. The NFA imposed an annual tax of $500 on importers or manufacturers of firearms, and $200 on dealers. NFA Sec. 2.

34. The NFA also imposed a $200 tax on the transfer of each firearm. NFA Sec. 3.

35. The Prohibition Era produced, at the time, a unique challenge: interstate organized criminals. Even when confronting organized criminals who crossed state lines, Congress relied on its taxing power rather than claiming a general Commerce Clause power to prohibit firearm possession.

36. Attorney General Homer Cummings, the bill's chief proponent, conceded the limits of federal power when he testified in support of the NFA. "[W]e have no inherent police powers to go into certain localities and deal with local crime. It is only when we can reach those things under the interstate commerce provision, or under the use of the mails, or by the power of taxation, that we can act." *National Firearms Act: Hearings on H.R. 9066 Before the H. Comm. on Ways & Means*, 73d Cong. 11 (1934) (statement of Homer S. Cummings, Att'y Gen.). He explained that a direct ban would raise constitutional problems, but a tax would not: "If we made a statute absolutely forbidding any human being to have a machine gun, you might say there is some constitutional question involved. But when you say, 'We will tax the machine gun,' and when you say that the absence of a license showing payment of the tax has been made indicates that a crime has been perpetrated, you are easily within the law." *Id.*

37. Congress's solution was to levy taxes on specified firearms and entities. Importantly, though it made the importation, manufacture, and sale of specific types of firearms more costly, it did not prohibit the possession, sale, or transfer of such weapons unless they lacked the requisite tax stamps. In crafting the NFA, Congress rested the law solely in its authority to tax.

**1938 Federal Firearms Act (FFA) – licensing scheme enacted on purported Commerce Clause authority**

38. Four years after the NFA, Congress enacted the Federal Firearm Act of 1938, 52 Stat. 1250 ("FFA").

39. Unlike the NFA, Congress explicitly rested its authority to regulate firearms on the Commerce Clause, even introducing it as "An Act to regulate commerce in firearms." FFA, 52 Stat. 1250.

40. The FFA made it unlawful for "any manufacturer or dealers … to transfer, ship, or receive any firearm or ammunition in interstate or foreign commerce" unless they had a license. FFA, Sec. 2(a).

41. The FFA requires "Any manufacturer or dealer desiring a license to transport, ship, or receive firearms or ammunition in interstate or foreign commerce" shall pay a licensing fee of $25 per year for manufacturers and $1 per year for dealers. FFA, Sec. 3(a).

42. Nothing in the FFA indicated that an individual who was only involved in intrastate commerce was required to obtain a license from the Secretary of the Treasury. FFA, Sec. 3(a).

43. In 1943, the Supreme Court examined section 2(f) of the FFA – felon in possession of firearm that was "shipped or transported in interstate or foreign commerce." *See* FFA, Sec. 2(f), and *Tot v. U.S.*, 319 U.S. 463 (1943).

44. In examining section 2(f) of the FFA, the Supreme Court acknowledged that both "courts below held that the offense created by the Act is confined to the receipt of firearms or ammunition as a part of interstate transportation and does not extend to the receipt, in an intrastate transaction." The Supreme Court also acknowledged that the "Government agrees that this construction is correct." *Tot v. U.S.*, 319 U.S. 463, 466 (1943).

45. The courts and the Executive Branch thus agreed that the FFA applied only to foreign and interstate commerce, and that it did not apply to intrastate commerce.

**1968 Gun Control Act (GCA)**

46. In 1968, Congress passed the Gun Control Act of 1968. Pub. L. No. 90-618, 82 Stat. 1213 ("GCA").

47. Title I of the Gun Control Act amended the Federal Firearms Act of 1938, and these sections can be found within the Criminal Code. Title II of the Gun Control Act amended the National Firearms Act of 1934, and these sections can be found within the Internal Revenue Code.

48. The Gun Control Act of 1968 "revised the National Firearms Act with the view of eliminating the defects in it which were revealed in Haynes." *U.S. v. Freed*, 401 U.S. 601, 602 (1971) (referring to *Haynes v. United States*, 390 U.S. 85 (1968). It also "enlarged and extended the Federal Firearms Act." *Barrett v. U.S.*, 423 U.S. 212, 220 (1976).

49. While the GCA made some changes to the NFA, it did not change the $500 tax per year on importers and manufacturers of firearms and the $200 tax per year on dealers. GCA, Part II, Sec. 5801

50. The GCA also did not change the $200 firearms transfer tax of $200 for each firearm. GCA, Part II, Sec. 5811(a).

51. Congress later restructured the special occupational tax. Today it is $1,000 per year for importers and manufacturers, with a reduced rate of $500 for small importers and manufacturers, and $500 per year for dealers. 26 U.S.C. § 5801. Unlike the making and transfer taxes, the special occupational tax is a flat levy on the business, not a tax on any particular firearm.

**THE *SILENCER SHOP* AND *JENSEN* INJUNCTIONS**

52. On July 4, 2025, Silencer Shop Foundation and several other entities and individual plaintiffs filed a lawsuit seeking a declaration that "the NFA's registration and transfer requirements pertaining to untaxed firearms exceed Congress's enumerated powers." *Silencer Shop Foundation v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, Case No. 6:25-cv-56-H, (Doc. # 1) (N.D. Tex., July 4, 2025).

53. This lawsuit followed the One Big Beautiful Bill Act's reduction to $0, effective January 1, 2026, of the NFA's making and transfer taxes on all NFA firearms except machineguns and destructive devices. Pub. L. No. 119-21, § 70436, 26 U.S.C. §§ 5811(a)(2), and 5821(a)(2).

54. Congress passed the One Big Beautiful Bill on July 3, 2025, and President Trump signed it into law on July 4, 2025.

55. On August 8, 2025, Silencer Shop amended their complaint and added 16 states as Plaintiffs to the lawsuit. *Silencer Shop*, (Doc. #15) (N.D. Tex., Aug. 8, 2025).

56. On October 9, 2025, John Jensen and several other individuals and entities filed a separate lawsuit seeking a declaration "that the NFA's requirements relating to making, transferring, receiving, possessing, or otherwise using untaxed firearms exceed Congress's enumerated powers, both facially and as-applied." *Jensen v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, Case No. 2:25-cv-233 (Doc. # 1) (N.D. Tex., Oct. 9, 2025).

57. The *Jensen* case was consolidated with *Silencer Shop*. *See Jensen*, (Doc. # 66) (N.D. Tex. June 8, 2026); and *Silencer Shop* (Doc. # 116).

58. On August 5, 2026, Judge James Hendrix entered two injunctions. *Silencer Shop*, (Doc. # 137) (N.D. Tex., Aug. 5, 2026).

59. The first injunction as to all *Silencer Shop* and *Jensen* plaintiffs:

> enjoins the Bureau of Alcohol, Tobacco, Firearms and Explosives, the United States Department of Justice, Todd Blanche in his official capacity, Robert Cekada in his official capacity, their divisions, bureaus, agents, officers, commissioners, employees, and anyone acting in concert or participation with them, including their successors in office, from enforcing the challenged provisions of the National Firearms Act as to untaxed firearms against the plaintiffs, and where applicable, the plaintiffs' agencies, political subdivisions, members, and customers—both current and future. The challenged NFA provisions are:
>
> - 26 U.S.C. § 5812(a)-(b);
> - 26 U.S.C. § 5822;
> - 26 U.S.C. § 5841(a)-(c), (e);
> - 26 U.S.C. § 5861(b)-(f);
> - 27 C.F.R. § 479.62(a)-(d); and
> - 27 C.F.R. § 479.84(a)-(d).
>
> *Id.* at 1-2 (*Silencer Shop* Injunction).

60. The second injunction was only applicable to the *Jensen* plaintiffs:

> Further, the Bureau of Alcohol, Tobacco, Firearms and Explosives, the United States Department of Justice, Todd Blanche in his official capacity, Robert Cekada in his official capacity, their divisions, bureaus, agents, officers, commissioners, employees, and anyone acting in concert or participation with them, including their successors in office, are permanently enjoined from enforcing the following additional challenged NFA provision as to untaxed firearms against the *Jensen* plaintiffs and, where applicable, their members and customers:
>
> - 26 U.S.C. § 5842(b); and
> - 26 U.S.C. § 5861(i).
>
> *Id.* at 2 (*Jensen* Injunction).

61. Plaintiff Gee is a member of Gun Owners Foundation, a plaintiff in the *Silencer Shop Foundation* lawsuit. Because Gee is not a member of any Jensen plaintiff, only the *Silencer Shop* Injunction restrains Defendants as to him.

62. Plaintiff Abt is a member of FPC Action Foundation, one of the *Jensen* plaintiffs. Accordingly, both the *Silencer Shop* and the *Jensen* Injunctions restrain Defendants as to him.

63. The protection those injunctions afford Gee and Abt is derivative and contingent. It depends on their continued membership in plaintiff organizations. Gee and Abt therefore seek relief in their own right.

64. Plaintiff 1836 LLC is not a member or customer of either the *Silencer Shop Foundation* or the *Jensen* plaintiffs' group. Plaintiff 1836 LLC knows that the *Jensen* Injunction does not apply to it, but there is a question of law as to whether the *Silencer Shop* injunction applies to it. Plaintiff 1836 LLC should not have to join an advocacy group to exercise its rights.

65. At the time of filing this complaint, there is a Motion for Clarification of Scope of Injunctive Relief filed by the plaintiff states which includes the state of Texas. *Silencer Shop*, (Doc. # 144) (N.D. Tex., Sept. 11, 2026).

66. The Plaintiff States, inquire "whether [the court's] injunction applies to the States as sovereigns, encompassing all relevant transfers with the geographic boundaries of the States, or whether the injunction applies only to transfers involving the States' agencies and their political subdivisions." *Id.* at 6.

67. Plaintiff 1836 LLC is formed under the laws of Texas, and it wishes to manufacture and deal in firearm silencers within the state of Texas.

68. Plaintiff 1836 LLC desires that the same injunction entered on behalf of the *Silencer Shop* and *Jensen* plaintiffs be entered against Defendants on its behalf.

69. Plaintiff Gee understands that the *Jensen* injunction does not apply to him. Gee desires that the same injunction entered on behalf of the *Jensen* plaintiffs be entered against Defendants on his behalf.

**27 C.F.R. §§ 479.88, AND 479.103 ARE UNCONSTITUTIONAL**

70. The NFA/GCA also creates a burdensome registration scheme that a manufacturer or dealer must comply with to lawfully manufacture or deal in silencers. 27 C.F.R. §§ 479.88, and 479.103.

71. Before transferring a silencer to a Federal Licensed Dealer, Plaintiffs are required to fill out Form 3 in order to not pay the transfer tax. The One Big Beautiful Bill Act reduced the transfer

tax on silencers to $0. 26 U.S.C. § 5811(a). Nonetheless even though Plaintiffs no longer are required to pay the transfer tax, if Plaintiffs choose to sell to a federal firearms licensee, ATF requires that they fill out Form 3, requiring them to provide the ATF with: (i) the name and address of the transferor and transferee; (ii) the Federal firearms license and special (occupational) tax stamp of the transferor and of the transferee, (iii) the name and address of the manufacturer and the importer of the firearm; (iv) type, model, serial number and other marks of identification of the firearm; and (v) a "statement by the transferor that he is entitled to the exemption because the transferee is a person qualified under this part to manufacture, import, or deal in firearms." 27 C.F.R § 479.88.

72. As dealers in silencers engaged only in intrastate commerce, and who are no longer subject to paying a transfer tax, Plaintiffs contend that Defendants requiring them to report on Form 3 all transactions with Licensed Dealers is unconstitutional as applied to them.

73. Furthermore, as a manufacturer of silencers, Plaintiffs are required to file with the Director, Form 2. Form 2 reports "all firearms manufactured by him during a single day." Form 2 also requires the manufacturer to identify his "Federal firearms license." Form 2 also requires the manufacturer to show the "serial numbers." 27 C.F.R. § 479.103.

74. As a manufacturer of silencers that are only sold in intrastate commerce, and in light of the fact that Congress decided to no longer tax the making or transferring of silencers, Plaintiffs contend that Defendants' requirement that they report daily all firearms they manufacture is unconstitutional as applied to them.

75. Neither 27 C.R.F. § 479.88 nor § 479.103 is among the provisions enjoined in *Silencer Shop*. Absent relief from this Court, Defendants remain free to enforce both against Plaintiffs, even as to suppressors that Congress no longer taxes.

76. The special occupational tax does not save these requirements. That tax is a flat annual levy on the business, not on any firearm. 26 U.S.C. § 5801. Collecting it does not require a daily, item-by-item report of every suppressor a manufacturer makes, or federal pre-approval of each sale between licensees. Those requirements are not necessary and proper to the collection of a tax that does not depend on them.

77. Plaintiffs plead in the alternative. If the GCA licensing provisions are upheld as applied to Plaintiffs, then 27 C.F.R. §§ 479.88 and 479.103 are unconstitutional as applied to Plaintiffs as licensees. If the GCA licensing provisions are held unconstitutional as applied to Plaintiffs, then Plaintiffs, as unlicensed makers and transferors, would be subject to 27 C.F.R. §§ 479.62 and 479.84, which are likewise unconstitutional as applied to untaxed suppressors.

**18 U.S.C. § 923 IS UNCONSTITUTIONAL**

78. The GCA defines manufacturer as "any person engaged in the business of manufacturing firearms or ammunition for purposes of sale or distribution." GCA, Part I, Sec. 921(a)(10).

79. The GCA also defines dealer as "(A) any person engaged in the business of selling firearms at wholesale or retail, (B) any person engaged in the business of repairing firearms or of making or fitting special barrels, stocks, or trigger mechanisms to firearms, or (C) any person who is a pawnbroker." GCA, Part I, Sec. 921(a)(11).

80. Neither the definition of manufacturer or dealer is limited to those engaged in interstate or foreign commerce.

81. While § 922 of the GCA listed a plethora of crimes that would be illegal for an individual to commit regarding "interstate or foreign commerce" unless the individual was a licensed dealer, it does not appear that Congress intended for § 922 to regulate intrastate transactions.

82. In fact, the GCA used the phrase "interstate or foreign commerce" 12 times in § 922 and only used the term "intrastate transactions" once. GCA, Part I, Sec. 922. The only time "intrastate transactions" was used in the original GCA is found in Part I, Sec. 922(b)(3) ("It shall be unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector to sell or deliver … (3) any firearm to any person who the licensee knows or has reasonable cause to believe does not reside in … the State in which the licensee's place of business is located, except that this paragraph (A) shall not apply to the sale or delivery of a rifle or shotgun to a resident of a State contiguous to the State in which the licensee's place of business is located if the purchaser's State of residence permits such sale or delivery by law, the sale fully complies with the legal conditions of sale in both such contiguous States, and the purchaser and the licensee have, prior to the sale, or deliver for sale, of the rifle or shotgun, complied with all of the requirements of section 922(c) applicable to intrastate transactions other than at the licensee's business premises …").

83. The current version of 18 U.S.C. § 922 contains the phrase "interstate or foreign commerce" 22 times and eliminated the phrase "intrastate transactions" altogether.

84. Section 922 of the GCA follows the general provisions of the FFA, although it does expand those provisions.

85. With Title I, sec. 923, the GCA created a new section that was not contained in the FFA. This new section prohibited all individuals engaged 'in business as a firearms or ammunition importer, manufacturer, or dealer" from engaging in their business until they obtained a license from the Secretary. GCA, Part I, Sec. 923.

86. Unlike Sec. 922 of the GCA, section 923 does not put the limiting language of "in interstate or foreign commerce." GCA, Part I, Sec. 922(a).

87. The criminal prohibition that enforces the license requirement, 18 U.S.C. § 922(a)(1)(A), likewise contains no interstate-commerce element in its first clause. It makes it unlawful for any person except a licensee "to engage in the business of importing, manufacturing, or dealing in firearms," and a willful violation is punishable by up to five years in prison. 18 U.S.C. § 924(a)(1)(D).

88. By the passage of the GCA, Congress codified both a taxing scheme and a licensing scheme.

89. For the first time, Congress used its Commerce Clause power to regulate intrastate commerce by requiring all manufacturers, dealers, and those engaged in the repair of firearms to purchase a license even if their entire business was intrastate.

90. As a result of 18 U.S.C. § 923, an individual who is a manufacturer or dealer in silencers must obtain a license from the United States, even if that individual never intends to manufacture or sell goods across state lines.

91. Plaintiffs contend that 18 U.S.C. §§ 922(a)(1)(A) and 923(a) are unconstitutional as applied to them since Congress does not have the authority under the Commerce Clause to require manufacturers and dealers to obtain a license when the purpose of that license is to enable them to engage in the manufacture and dealing in silencers in intrastate commerce.

**PORTIONS OF THE GCA HAVE BEEN FOUND UNCONSTITUTIONAL**

92. Over the years, the Supreme Court has found that portions of the GCA are unconstitutional.

93. In 1995, the Supreme Court determined that 18 U.S.C. § 922(q) was unconstitutional as the Gun-Free School Zones Act exceeded Congress' Commerce Clause authority. *U.S. v. Lopez*, 514 U.S. 549 (1995).

94. *Lopez* emphasized that § 922(q) contained "no express jurisdictional element which might limit its reach to a discrete set of firearm possessions that additionally have an explicit connection

with or effect on interstate commerce." 514 U.S. at 562. The licensing requirement of §§ 922(a)(1)(A) and 923(a) suffers from the same defect.

95. This year, the Supreme Court held that 18 U.S.C. § 922(g)(3), which prohibits an unlawful user of a controlled substance from possessing a firearm, violated the Second Amendment as applied to the defendant. *United States v. Hemani*, 608 U.S. 772 (2026). Writing separately, Justice Thomas explained that, as "a matter of both original meaning and this Court's precedents, § 922(g)(3) appears to exceed Congress's enumerated power to regulate interstate commerce." *Id.* at 795 (Thomas, J. concurring).

**AN EXAMINATION OF THE ORIGINAL MEANING OF THE COMMERCE CLAUSE REVEALS THAT CONGRESS DOES NOT HAVE POWER TO REGULATE PURELY INTRASTATE COMMERCE**

96. Under Article I, Section 8, Clause 3 of the U.S. Constitution, the Founders gave Congress the power "to regulate commerce with foreign nations, and among the several states, and with the Indian tribes." The Founders intended "among states" to govern interstate commerce exclusively, not within the state itself.

97. At the founding, "commerce" meant "selling, buying, and bartering, as well as transporting for these purposes." *United States v. Lopez*, 514 U.S. 549, 585 (1995) (Thomas, J., concurring). It did not include manufacturing. *Id.* at 586.

98. Chief Justice Marshall recognized this limit in the Court's first great Commerce Clause case: "The completely internal commerce of a State, then, may be considered as reserved for the State itself." *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 195 (1824).

99. For more than a century afterward, the Court adhered to the distinction between manufacturing and commerce. "No distinction is more popular to the common mind, or more clearly expressed in economic and political literature, than that between manufactures and

commerce." *Kidd v. Pearson*, 128 U.S. 1, 20 (1888). "Commerce succeeds to manufacture, and is not a part of it." *United States v. E.C. Knight Co.*, 156 U.S. 1, 12 (1895).

100. Thomas Jefferson was deeply committed to economic development and national unity. However, throughout his life, he made clear that he did not see the Commerce Clause as a broad grant of power to Congress.

101. On February 15, 1791, Jefferson wrote to President Washington a legal opinion regarding the United States Bank Bill highlighting the limitation on Congress under the Commerce Clause. Jefferson wrote that "the power given to Congress by the Constitution does not extend to the internal regulation of the commerce of a State, (that is to say of the commerce between citizen and citizen,) which remain exclusively with its own legislature …". Thomas Jefferson, *Opinion on the Constitutionality of a National Bank*, in 5 The Writings of Thomas Jefferson 284, 286 (Paul Leicester Ford ed., 1895).

102. Late in life, Thomas Jefferson wrote a letter to William Branch Giles (U.S. Senator for Virginia) in which he warned that Congress was "advancing towards the usurpation of all the rights reserved to the states." Thomas Jefferson, *Letter from Thomas Jefferson to William Branch Giles* (Dec. 26, 1825), in 10 *The Writings of Thomas Jefferson* 354 (Paul Leicester Ford ed., 1899).

103. Jefferson was concerned that if Congress used the power to regulate commerce, it would assume control over agriculture and manufacturing, something Jefferson believed was wholly outside Congress' purview.

104. James Madison also rejected the idea that the Commerce Clause authorized Congress to regulate commerce within the states. On March 3, 1817, Madison vetoed the Bonus Bill. "The legislative powers vested in Congress," he wrote, "are specified and enumerated … and it does not appear that the power proposed to be exercised by the bill is among the enumerated

powers." James Madison, *Veto Message* (Mar. 3, 1817), in 1 *A Compilation of the Messages and Papers of the Presidents* 569 (James D. Richardson ed., 1907).

105. Madison conceded that any broad construction of the Commerce Clause would effectively obliterate constitutional limits. "Such a view of the Constitution would have the effect of giving to Congress a general power of legislation," he warned, "instead of the defined and limited one hitherto understood to belong to them." *Id.* at 570.

106. In his *Commentaries on the Constitution*, Justice Joseph Story examined the "nature and extent of the power to regulate commerce." Joseph Story, 2 *Commentaries on the Constitution of the United States* § 971, at 440 (Boston, Hilliard, Gray & Co. 1833).

107. Justice Story emphasized that certain state laws, though they may incidentally affect commerce, are not regulations of commerce but exercises of the police power. *Id.* § 1024, at 482. Among these laws included were "laws to direct the removal of gun-powder." *Id*. § 1024, at 483. This measure, Story wrote, "unquestionably remains, and ought to remain with the states." *Id*. The decision as to where to store the powder does not contribute to revenue, it falls squarely under the "health laws of a state." *Id*. at 484.

**THE EIGHTEENTH AMENDMENT DEMONSTRATES THAT CONGRESS DOES NOT HAVE POWER TO REGULATE INTRASTATE COMMERCE**

108. To understand how Congress historically understood its limitations under the Commerce Clause, one only needs to turn to the history of the Eighteenth Amendment. For the first 130 years of the Nation's history, Congress did not claim that the Commerce Clause empowered it to prohibit the intrastate manufacture or sale of intoxicating liquor. Congress instead taxed alcohol and regulated its interstate transportation.

109. The First Congress passed the Revenue Act of 1791, signed by President Washington on March 3, 1791. This Act imposed a tax on domestically distilled spirits to generate

revenue for the federal government. (Revenue Act of 1791, ch. 15, 1 Stat. 199 (1791)). It did not otherwise restrict or regulate the manufacture, sale, or transportation of alcohol.

110. As the national temperance movement sought prohibition, Senator Henry W. Blair of New Hampshire introduced a proposed constitutional amendment in 1876 to prohibit the manufacture, sale, and importation of alcoholic beverages. In 1890, nearly 100 years after the ratification of the Constitution, Congress invoked the Commerce Clause to enact the Wilson Act. Rather than directly prohibiting its manufacture or sale, the Act enabled the states to regulate imported liquor as soon as it crossed their borders. Wilson Act, ch. 728, 26 Stat. 313 (1890).

111. Despite the sustained national effort to prohibit alcohol, Congress used its commerce power only to regulate interstate transportation and to permit state police-power regulation after interstate transportation ended. Congress did not claim authority under the Commerce Clause to impose a nationwide prohibition on intrastate manufacture or sale. The result required the Eighteenth Amendment. If the Commerce Clause already authorized Congress to prohibit intrastate activity because of its effect on a national market, there would have been no need to amend the Constitution.

**_GONZALES V. RAICH_ DOES NOT CONTROL, AND IF IT DOES, IT SHOULD BE OVERRULED**

112. The original public meaning of the Commerce Clause, confirmed by early judicial and legislative practice, does not reach the purely intrastate manufacture and sale of goods.

113. Defendants will invoke *Wickard* and *Raich*. Neither controls.

114. *Raich* upheld application of the Controlled Substances Act to home-grown marijuana because Congress had enacted a comprehensive scheme to eliminate a fungible commodity from the national market, and exempting intrastate production would leave a "gaping hole" in that scheme. 545 U.S. at 22. No comparable scheme exists for suppressors. Congress has

repealed the federal tax on making and transferring them, Pub. L. No. 119-21, § 70436, and this Court has held the NFA's registration and transfer provisions unenforceable as to untaxed firearms. *Silencer Shop*, Doc. 137. Requiring a federal license of a Texas business that makes suppressors in Texas, for sale only to Texas residents, fills no gap in any federal scheme.

115. Nor can the Necessary and Proper Clause sustain the licensing requirement as applied to Plaintiffs. A law is not "proper" if it undermines "the structure of government established by the Constitution." *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 559 (2012) (opinion of Roberts, C.J.). Texas has enacted its own regime for suppressors made and sold within its borders. Displacing that regime with a federal license requirement for wholly intrastate commerce, after Congress itself has abandoned taxing and tracking those suppressors, is neither necessary nor proper.

116. To the extent *Wickard* or *Raich* forecloses Plaintiffs' Commerce Clause claims, those decisions were wrongly decided and should be overruled. *See Raich*, 545 U.S. at 57-74 (Thomas, J., dissenting). Plaintiffs raise these claims in good faith to preserve them for review by the Supreme Court.

**COUNT ONE**
**Violation of the U.S. Constitution – Commerce Clause**
**The NFA's Regulation of Untaxed Firearms Exceeds Congress's Authority**

117. Plaintiffs incorporate by reference all paragraphs preceding Count One as though set forth fully herein.

118. The NFA's registration and related requirements on untaxed firearms exceed Congress' enumerated powers and are thus unconstitutional as determined by Judge James Hendrix in the case of *Silencer Shop Foundation v. Bureau of Alcohol, Tobacco, Firearms and Explosives,* Case No. 6:25-cv-056-H (Doc. # 137) (N.D. Tex, Aug. 5, 2026).

119. Congress passed the NFA explicitly premised on, and the Supreme Court upheld the NFA as an exercise of, Congress's taxing power. *Sonzinsky*, 300 U.S. at 513-14.

120. As a result of the Big Beautiful Bill § 70436, nearly all of the firearms covered by the NFA, except for a machinegun or a destructive device, are now untaxed. Yet the comprehensive registration scheme to make, transfer, receive, or possess those firearms remains in effect.

121. Individual Plaintiffs and 1836 LLC and its customers are injured by the NFA's unconstitutional requirements.

122. Plaintiffs are entitled to a declaration that the NFA's requirements to make, transfer, receive, possess, or otherwise use firearms untaxed under the NFA, and any regulations implementing them, exceed Congress's enumerated powers and are thus unconstitutional, both facially and/or as applied to Individual Plaintiffs, 1836 LLC and its customers. *See e.g.*, 26 U.S.C. §§ 5811; 5812; 5821; 5822; 5841; 5861; 5871; 5872(a); 18 U.S.C. § 3571; 27 C.F.R. §§ 479.62; 479.84; 479.88; and 479.103.

123. Plaintiffs are entitled to a permanent injunction against Defendants from implementing or otherwise enforcing the NFA's registration requirements to make, transfer, receive, possess, or otherwise use firearms untaxed under the NFA and any regulations implementing those registration requirements. *See e.g.*, 26 U.S.C. §§ 5811; 5812; 5821; 5822; 5841; 5861; 5871; 5872(a); 18 U.S.C. § 3571; 27 C.F.R. §§ 479.62; 479.84; 479.88; and 479.103.

**COUNT TWO**
**Violation of the U.S. Constitution – Second Amendment**
**The NFA's Regulation of Suppressors Violates Plaintiffs' Right to Keep and Bear Arms**

124. Plaintiffs incorporate by reference all paragraphs preceding Count One as though set forth fully herein.

125. The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II.

126. "Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008) (citations omitted); *see also N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 28 (2022) ("[E]ven though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense.").

127. The Supreme Court's test for addressing Second Amendment challenges states: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.

128. By regulating suppressors, the NFA regulates the use of bearable arms in common use by Americans for lawful purposes. Suppressors are neither dangerous nor unusual and their possession is protected by the Second Amendment. There is no historical tradition that would justify the NFA's comprehensive registration scheme for protected arms.

129. *United States v. Peterson*, 161 F.4th 331 (5th Cir. 2025), does not foreclose this claim. *Peterson* upheld the NFA's requirements, as applied to a regime in which suppressors were taxed, by analogy to the "shall-issue" licensing regimes described in *Bruen*, 597 U.S. at 38 n.9. That rationale does not survive the repeal of the tax. A registration and pre-approval scheme

detached from any tax does not license the carrying of arms; it maintains a federal inventory of protected arms and their owners. And even shall-issue regimes may not be "put toward abusive ends" through "lengthy wait times" or "exorbitant fees." *Id.*

130. The continued requirement for notifying the federal government every time an untaxed silencer is manufactured in 27 C.F.R. § 479.103 violates the Second Amendment. This is currently enforced by the governmental Defendants using NFA Form 2.

131. Defendants therefore violate the Second Amendment right to keep and bear arms by forcing law-abiding Americans, including Individual Plaintiffs, and 1836 LLC and its customers, under pain of felony violation, to comply with the challenged provisions of the NFA to make, transfer, receive, possess, or otherwise use suppressors.

132. 1836 LLC may also assert the Second Amendment rights of its prospective customers, whose ability to acquire suppressors depends on 1836 LLC's ability to make and sell them. *See Craig v. Boren*, 429 U.S. 190, 195 (1976); *Carey v. Population Servs. Int'l*, 431 U.S. 678, 682-84 (1977).

133. Defendants' enforcement of the NFA forces Individual Plaintiffs, 1836 LLC and its customers either to comply with the unconstitutional registration scheme or be subjected to criminal prosecution.

134. Therefore, as a direct and proximate result of the above infringement and impermissible burden on Second Amendment rights, Individual Plaintiffs, and 1836 LLC and its customers have suffered, and continue to suffer, from an unlawful and irreparable deprivation of the fundamental constitutional right to keep and bear arms.

135. Plaintiffs are entitled to a declaration that the NFA's requirements with respect to the making, transferring, receiving, possessing, or otherwise using suppressors, along with the

regulations that implement them, violate the Second Amendment and are thus unconstitutional both facially and/or as applied to Individual Plaintiffs, 1836 LLC and its customers. *See e.g.*, 26 U.S.C. §§ 5811; 5812; 5821; 5822; 5841; 5861; 5871; 5872(a); 18 U.S.C. § 3571; 27 C.F.R. §§ 479.62; 479.84; 479.88; and 479.103.

136. Plaintiffs are entitled to a permanent injunction against Defendants from implementing or otherwise enforcing any part of the NFA and related regulations that pertain to untaxed suppressors. *See e.g.*, 26 U.S.C. §§ 5811; 5812; 5821; 5822; 5841; 5861; 5871; 5872(a); 18 U.S.C. § 3571; 27 C.F.R. §§ 479.62; 479.84; 479.88; and 479.103.

## COUNT THREE
**Violation of the U.S. Constitution – Commerce Clause**
**The GCA's Requirement that Manufacturers and Dealers of Silencers Engaged in Intrastate Commerce Obtain a License Exceeds Congress's Authority**

137. Plaintiffs incorporate by reference all paragraphs preceding Count One as though set forth fully herein.

138. The GCA's license requirement for manufacturers and dealers engaged in intrastate commerce exceeds Congress's enumerated powers and is thus unconstitutional.

139. When Congress passed the FFA, it did not require those who were engaged in the manufacture or dealing in silencers in intrastate commerce to obtain a license.

140. It was not until the passage of the GCA that Congress mandated licenses of those engaged in the intrastate business of manufacturing or dealing in silencers to obtain a license.

141. Requiring a federal license for the purely intrastate manufacture and sale of suppressors is not a regulation of commerce among the several States, and it is not necessary and proper to the regulation of such commerce, particularly now that Congress has repealed the federal tax on suppressors and the NFA's registration provisions are unenforceable as to untaxed firearms.

142. Individual Plaintiffs and 1836 LLC and its customers are injured by the GCA's unconstitutional requirements.

143. Plaintiffs are entitled to a declaration that the GCA's requirements that they must obtain a license while they are engaged in the business of manufacturing or dealing in silencers in intrastate commerce, exceed Congress' enumerated powers and are thus unconstitutional, as applied to Individual Plaintiffs, 1836 LLC and its customers. *See* 18 U.S.C. §§ 922(a)(1)(A), 923(a), and 924(a)(1)(D).

144. Plaintiffs are entitled to a permanent injunction against Defendants from implementing or otherwise enforcing the GCA's licensing requirements if they are only engaged in intrastate commerce. *See* 18 U.S.C. §§ 922(a)(1)(A), 923(a), and 924(a)(1)(D).

**COUNT FOUR**
**Violation of the U.S. Constitution – Second Amendment**
**The GCA's Licensing Requirement Violates their Right to Bear Arms**

145. Plaintiffs incorporate by reference all paragraphs preceding Count One as though set forth fully herein.

146. The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II.

147. "Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. 570, 582 (2008) (citations omitted); *see also Bruen*, 597 U.S. at 28 ("[E]ven though the Second Amendment's definition of 'arms' is fixed according to its

historical understanding, that general definition covers modern instruments that facilitate armed self-defense.”).

148. The Supreme Court’s test for addressing Second Amendment challenges states: “When the Second Amendment’s plain text covers an individual’s conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation’s historical tradition of firearm regulation.” *Bruen*, 597 U.S. at 24.

149. By requiring a license, the GCA regulates the use of bearable arms in common use by Americans for lawful purposes. Suppressors are neither dangerous nor unusual and their possession is protected by the Second Amendment. There is no historical tradition that would justify the GCA’s licensing scheme for protected arms.

150. *Heller*’s reference to “presumptively lawful” “conditions and qualifications on the commercial sale of arms,” 554 U.S. at 626-27 & n.26, does not relieve Defendants of their burden under *Bruen*. Defendants must still show that the particular condition is consistent with the Nation’s historical tradition of firearm regulation. There is no founding-era tradition of requiring a national license to make or sell arms within a single State. And as applied to Plaintiffs, the licensing regime imposes the wait times, inspections, recordkeeping, and fee described above.

151. Defendants therefore violate the Second Amendment right to keep and bear arms by forcing law-abiding Americans, including Individual Plaintiffs, and 1836 LLC and its customers, under pain of felony violation, to comply with the challenged provisions of the GCA to obtain a license in order to conduct intrastate manufacturing and dealing of silencers.

152. Defendants' enforcement of the GCA forces Individual Plaintiffs, 1836 LLC and its customers either to comply with the unconstitutional licensing scheme or be subjected to criminal prosecution.

153. Therefore, as a direct and proximate result of the above infringement and impermissible burden on Second Amendment rights, Individual Plaintiffs, and 1836 LLC and its customers have suffered, and continue to suffer, from an unlawful and irreparable deprivation of the fundamental constitutional right to keep and bear arms.

154. Plaintiffs are entitled to a declaration that the GCA's licensing requirements with respect to the manufacturing and dealing of silencers violate the Second Amendment and are thus unconstitutional as applied to Individual Plaintiffs, 1836 LLC and its customers. *See* 18 U.S.C. §§ 922(a)(1)(A), 923(a), and 924(a)(1)(D).

155. Plaintiffs are entitled to a permanent injunction against Defendants from implementing or otherwise enforcing any part of the GCA and related regulations that pertain to the unconstitutional licensing requirements. *See* 18 U.S.C. §§ 922(a)(1)(A), 923(a), and 924(a)(1)(D).

**COUNT FIVE**
**Violation of the U.S. Constitution – Tenth Amendment**
**The GCA's Licensing Requirement Violates the State's Police Powers**

156. Plaintiffs incorporate by reference all paragraphs preceding Count One as though set forth fully herein.

157. The Tenth Amendment of the U.S. Constitution provides that "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

158. Congress does not have the power to regulate intrastate commerce through the enforcement of regulatory regimes.

159. The GCA's licensing requirement with threats of arrest against the individual Plaintiffs and 1836 LLC for activities solely within the State of Texas violates the Tenth Amendment as applied to Plaintiffs

160. The states retain the primary plenary power to protect the general health, safety, morals, and general welfare of their citizens.

161. Individuals may challenge federal action that exceeds Congress' enumerated powers and intrudes on the powers reserved to the States. *Bond v. United States*, 564 U.S. 211, 220-24 (2011).

162. Texas has exercised its reserved police power to regulate suppressors made and sold within its borders. Tex. Gov't Code 2.001 *et seq.* As applied to Plaintiffs, the GCA licensing provisions displace that sovereign choice.

163. Plaintiffs are entitled to a declaration that the GCA's licensing requirements with respect to the manufacturing and dealing of silencers violate the Tenth Amendment and are unconstitutional as applied to Individual Plaintiffs, 1836 LLC and its customers. *See* 18 U.S.C. §§ 922(a)(1)(A), 923(a), and 924(a)(1)(D).

164. Plaintiffs are entitled to a permanent injunction against Defendants from implementing or otherwise enforcing any part of the GCA and related regulations that pertain to the unconstitutional licensing requirements. *See* 18 U.S.C. §§ 922(a)(1)(A), 923(a), and 924(a)(1)(D).

**COUNT SIX**
**Declaratory Judgment, 28 U.S.C. § 2201**
**18 U.S.C. §§ 922(a)(1)(A) and 923(a) Do not Reach Purely Intrastate Manufacture and Sale**

165. Plaintiffs incorporate by reference all paragraphs preceding Count One as though set forth fully herein.

166. Courts do not read a federal statute to reach purely local conduct, and thereby alter the balance between federal and state power, absent a clear statement from Congress. *Bond v. United States*, 572 U.S. 844, 857-60 (2014); *Jones v. United States*, 529 U.S. 848, 857-58 (2000) (construing federal arson statute narrowly to avoid Commerce Clause concerns).

167. Section 923 defines the license it requires by reference to interstate commerce: the license entitles its holder "to transport, ship, and receive firearms and ammunition covered by such license in interstate or foreign commerce." 18 U.S.C. § 923(c). The FFA, from which the GCA's licensing provisions descend, reached only interstate and foreign commerce, as both the courts and the Executive Branch agreed. *Tot*, 319 U.S. at 465.

168. Read in light of § 923(c), the FFA's history, and the clear-statement rule, §§ 922(a)(1)(A) and 923(a) do not require a federal license of a person who manufactures or deals in firearms solely within one State and does not ship, transport, or receive firearms in interstate or foreign commerce. Construing them otherwise would raise the serious constitutional questions presented in Counts Three, Four, and Five.

169. Plaintiffs are entitled to a declaration that 18 U.S.C. §§ 922(a)(1)(A) and 923(a) do not require them to obtain a federal firearms license to manufacture and deal in suppressors solely within Texas, and to an injunction barring Defendants from enforcing those provisions, or 18 U.S.C. § 924(a)(1)(D), against them for such conduct.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that this court enter the following relief:

A. Declare that the NFA's requirements relating to making, transferring, receiving, possessing, or otherwise using untaxed firearms exceed Congress's enumerated powers, both facially and as applied;

B. Declare that any regulation promulgated, in whole or in part, under such requirements are unlawful;

C. Declare that such requirements and any regulation implementing them violate the Second Amendment with respect to suppressors, both facially and as applied;

D. Enjoin Defendants and their employees, agents, successors, or any other person acting in concert with them, from implementing, enforcing, or otherwise acting under the authority of the NFA with respect to violations in any way predicated on failure to comply with the NFA's unconstitutional provisions pertaining to making, transferring, receiving, possessing, or using untaxed firearms or, in the alternative, untaxed suppressors, against Individual Plaintiffs, 1836 LLC and its customers – both current and future;

E. Enjoin Defendants and their employees, agents, successors, or any other person acting in concert with them, from implementing, enforcing, or otherwise acting under the authority of all regulations promulgated to effectuate the challenged NFA requirements, including, but not limited to, 27 C.F.R. §§ 479.62, 479.84, 479.88, and 479.103, against Individual Plaintiffs, 1836 LLC and its customers – both current and future.

F. Declare that the GCA's licensing requirements relating to manufacturing and dealing in silencers in intrastate commerce exceed Congress enumerated powers as applied to Plaintiffs;

G. Declare that any regulation promulgated, in whole or in part, under such requirements are unlawful;

H. Declare that such requirements and any regulation implementing them violate the Second Amendment as applied to Plaintiffs;

I. Declare that 18 U.S.C. §§ 922(a)(1)(A) and 923(a) do not require Plaintiffs to obtain a federal firearm license to manufacture and deal in silencers solely within Texas;

J. Declare that such requirements and any regulation implementing them violate the Tenth Amendment as applied to Plaintiffs;

K. Enjoin Defendants and their employees, agents, successors, or any other person acting in concert with them, from implementing, enforcing, or otherwise acting under the authority of the GCA with respect to violations in any way predicated on failure to comply with the GCA's licensing requirements relating to manufacturing and dealing in silencers involved in intrastate commerce against Individual Plaintiffs, 1836 LLC and its customers – both current and future;

L. Enjoin Defendants and their employees, agents, successors, or any other person acting in concert with them, from implementing, enforcing, or otherwise acting under the authority of all regulations promulgated to effectuate the challenged GCA requirements against Individual Plaintiffs, 1836 LLC and its customers – both current and future.

M. Award Plaintiffs the costs of this action and reasonable attorneys' fees; and

N. Award Plaintiffs such other legal and equitable relief as is just and appropriate and as necessary to effectuate the Court's judgment.

Dated October 6, 2026

Respectfully Submitted,

/s/ Jerad Najvar
Jerad Najvar
Texas Bar No. 24068079
CHALMERS, ADAMS, BACKER & WALLEN, LLC
5744 W. Airport Blvd.
Houston, TX 77035
Telephone: (281) 404-4696
jnajvar@chalmersadams.com

Mark P. Meuser*
CHALMERS, ADAMS, BACKER & WALLEN, RLLP
1025 Bayside Dr. #412
Newport Beach, CA 92660
Telephone: (714) 982-4374
mmeuser@chalmersadams.com

* Application for *pro hac vice* admission forthcoming

*Attorneys for Plaintiffs*